## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | *      Criminal No. RDB-17-0288 |
| NATHANIEL THOMAS OAKS, | * |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

On May 31, 2017, the Grand Jury returned a nine-count Indictment (ECF No. 16) charging the Defendant Nathaniel T. Oaks ("Defendant" or "Senator Oaks"), at the time in question a Delegate in the Maryland General Assembly representing a portion of Baltimore City, with the corrupt use of his office in a bribery scheme. This initial Indictment charged three counts of wire fraud under 18 U.S.C. § 1343, one count of honest services wire fraud under 18 U.S.C. §§ 1343 and 1346, and five counts of Travel Act violations under 18 U.S.C. § 1952. (ECF No. 16) It is specifically alleged that Oaks, now a Senator in the General Assembly, accepted bribes during the time in question from "Mike," a confidential source of the Federal Bureau of Investigation ("FBI") posing as a businessman from Texas seeking business opportunities in a U.S. Department of Housing and Urban Development project in Baltimore.

On November 15, 2017, the Grand Jury returned a Superseding Indictment (ECF No. 31) adding a tenth count for obstruction of justice under 18 U.S.C. § 1512(c)(2). On January 19, 2018, this Court ordered that Count Ten be severed from Counts One through Nine. (ECF No. 55.) The Superseding Indictment, like the initial Indictment, includes a

forfeiture count in which the Government seeks forfeiture of at least $15,300 allegedly paid to Defendant Oaks over the course of the bribery scheme.

Pending now are (a) the Defendant's Motion to Dismiss Count Four (Honest Services Wire Fraud) (ECF No. 58) and (b) the Defendant's Motion to Dismiss Counts Five through Nine (Travel Act Counts) (ECF No. 57). The underlying premise in both motions is that Oaks' filing of a request with the Maryland Department of Legislative Services for the drafting of legislation in the form of a bond bill in September of 2016 was not an official act within the meaning of honest services wire fraud, as charged in Count Four, or the Travel Act violations, as charged in Counts Five through Nine.

After reviewing the parties' submissions, this Court conducted a hearing on March 16, 2018. The Defendant's arguments are without merit, as the submission of such a request by a member of the Maryland General Assembly is an official act. That act is within the ambit of honest services wire fraud, the Travel Act, the Maryland bribery statute, and the Supreme Court's recent opinion in *McDonnell v. United States*, 136 S. Ct. 2355 (2016). For the reasons set forth below, Defendant's Motion to Dismiss Count Four (ECF No. 58) is DENIED, and Defendant's Motion to Dismiss Counts Five through Nine (ECF No. 57) is also DENIED.

## BACKGROUND

The Defendant is charged in a ten-count Superseding Indictment that was returned by the Grand Jury on November 15, 2017. (ECF No. 31.)[1] Counts One through Nine stem from an alleged scheme in which the Defendant agreed to assist a purported real estate

---

[1] As a result of this Court having granted the Defendant's Motion to Sever (*see* ECF No. 55), trial on Count Ten is scheduled for a later date. (*See* ECF No. 72.)

developer identified as "Mike," who was actually an undercover FBI agent, in pursuing a housing development project in Baltimore. Counts One through Three charge wire fraud, in violation of 18 U.S.C. §1343. These first three counts allege that the Defendant made oral and written communications—which allegedly contained falsehoods—expressing support for Mike's project to a representative Oaks believed worked at the United States Department of Housing and Urban Development ("HUD").

Count Four charges honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346. The Superseding Indictment alleges that "[i]t was the purpose of the scheme for Oaks to secretly use his official position to enrich himself by accepting cash bribe payments from Mike in exchange for favorable official action." (ECF No. 31 at 7.) Specifically, the Superseding Indictment alleges that "Oaks agreed to use his official position . . . to file a request for bond bill legislation with [the Maryland Department of Legislative Services ] in exchange for a cash bribe payment from Mike." (Id.) The Superseding Indictment further alleges that on September 22, 2016, in exchange for a $5,000 cash payment from Mike, the Defendant "submitted a request, in person, to DLS for the drafting of legislation in the form of a bond bill for the 2017 Maryland General Assembly Session that would authorize the issuance of state funds to a company associated with Mike in the amount of $250,000 for the 'Multi-Family Housing Development at Druid Park Lake." (Id.) The Defendant allegedly received a completed draft bond bill from the Maryland Department of Legislative Services and forwarded the draft by email to Mike. (Id. at 7-8.)

The Superseding Indictment provides additional factual context regarding the legislative process in question. A bond bill "was legislation filed by a member of the General

Assembly to obtain State of Maryland funding for local capital projects. . . . [F]or such funding to be considered by the General Assembly, it had to be introduced by both a member of the House of Delegates and a member of the Senate." (*Id.* at 6.) The Maryland Department of Legislative Services ("DLS") is described as "a Maryland governmental entity . . . , which provided legal, fiscal, committee, research, reference, auditing, administrative, and technological support to the members of the Maryland General Assembly . . . . These services included the drafting of legislation for legislators." (*Id.*)

Counts Five through Nine charge violations of the Travel Act based on the Defendant's participation in five mobile phone calls with the intent to carry on bribery, in violation of Maryland state law, Md. Code, Criminal Law § 9-201, and in violation of 18 U.S.C. § 1952(a)(3) and (b)(2). These Counts incorporate by reference the relevant paragraphs of the prior counts – e.g., that the Defendant requested, received, and emailed a draft bond bill – and add that "Oaks engaged in an arrangement with Mike pursuant to which Oaks would receive and agreed to receive cash bribe payments in order to influence the performance of his official duties." (*Id.* at 9.)

On January 26, 2017, the Defendant submitted three pretrial motions: (1) Defendant's Motion to Dismiss Count 4 (Honest Services Wire Fraud) (ECF No. 58); (2) Defendant's Motion to Dismiss Counts 5-9 (Travel Act Counts) (ECF No. 57); and (3) Defendant's Motion to Charge the Jury on Entrapment (ECF No. 59). On March 7, 2018, this Court determined that no witness testimony would be necessary to consider these three

motions. (ECF No. 88.)[2] On March 14, 2018 the Defendant withdrew his Motion to Charge the Jury on Entrapment. (*See* ECF Nos. 89, 90.) On March 16, 2018, this Court heard oral argument on the Defendant's pending motions to dismiss (ECF Nos. 57, 58).

## STANDARD OF REVIEW

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment "be a plain, concise and definite written statement of the essential facts constituting the offense charged." Under Rule 12(b)(3)(B)(v), a Defendant may file a motion to dismiss challenging an indictment for failure to state an offense. The United States Court of Appeals for the Fourth Circuit has instructed that '[a]n indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense.'" *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997) (quoting *United States v. Daniels*, 973 F.2d 272, 274 (4th Cir. 1992)); *see also United States v. Palin*, 874 F.3d 418, 424 (4th Cir. 2017); *United States v. Hooker*, 841 F.2d 1225, 1231 (4th Cir. 1988).

In reviewing a motion to dismiss an indictment for failure to state an offense, a district court must accept all factual allegations in the indictment as true. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952), and the Court should construe the indictment in a "practical," rather than "purely technical," manner. *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994); *see United States v. Terry*, 257 F.3d 366, 371 (4th Cir. 2001) (King, J., concurring) ("It is elementary that a motion to dismiss [a count of the] indictment

---

[2] On March 14, 2018, the Defendant filed a letter that was essentially an unsolicited supplemental legal memorandum. (ECF No. 90.) The Government appropriately objected to the filing, which contravened Local Rule 105.2, and this Court struck the letter from the record. (*See* ECF Nos. 91, 93.)

implicates only the legal sufficiency of its allegations, not the proof offered by the Government.").

## ANALYSIS

### I. Introduction

"The basic compact underlying representative government assumes that public officials will hear from their constituents and act appropriately on their concerns." *McDonnell v. United States*, 136 S. Ct. 2355, 2372 (2016); *see also United States v. Mandel*, 672 F. Supp. 864, 878 (D. Md. 1987), *aff'd*, 862 F.2d 1067 (4th Cir. 1988) ("The people of Maryland, as a matter of natural law, have and have always had an inalienable right to good government."). While the compact itself may be "basic," the criminal laws aimed at enforcing it have evolved over the last few decades. Through both judicial interpretation – often based on constitutional concerns, *see e.g., id.* at 2372-73; *McNally v. United States*, 483 U.S. 350, 360 (1987) – and statutory amendment, the scope of bribery laws has waxed and waned twice over.

While several targeted statutes specifically outlaw various forms of "bribery" by *federal* officials, *see* 18 U.S.C. §§ 201-227, 665, the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 (mail), 1343 (wire), also criminalize bribery schemes by *state* and *local* officials. In 1909, the mail fraud statute, the predecessor to today's mail and wire fraud statutes, proscribed the use of mails to advance "any scheme or artifice to defraud, *or* for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." § 1341; *see Skilling v. United States*, 561 U.S. 358, 399 (2010) (emphasis added). With the identification of two *alternative* illicit uses of the mails, the term "scheme or artifice to defraud" was interpreted by the Circuit Courts of Appeals to include deprivations of *intangible* rights, giving

6

rise to the "intangible rights" or "honest services" doctrine that reached both public and private sector officials. *Id.* at 400-401 (citing *Shushan v. United States*, 117 F.2d 110 (5th Cir. 1941); *see also United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980); *United States v. Procter & Gamble Co.*, 47 F. Supp. 676, 678 (D. Mass. 1942)). By 1982, every Circuit had validated the honest services doctrine. *Skilling*, 561 U.S. at 401 (citing Hurson, *Limiting the Federal Mail Fraud Statute—A Legislative Approach*, 20 Am. Crim. L. Rev. 423, 456 (1983)[3]). Despite the consensus among the circuits, the honest-services decisions during this time "were not models of clarity or consistency." *Skilling*, 561 U.S. at 405.

The breadth of the mail and wire fraud statutes, enhanced by the honest services doctrine, armed federal prosecutors with incredible discretion. In 1974, Chief Justice Berger commented that the mail fraud statute "has traditionally been used against fraudulent activity as a first line of defense." *United States v. Maze*, 414 U.S. 395, 405-06 (1974) (Burger, C.J., dissenting) ("When a 'new' fraud develops—as constantly happens—the mail fraud statute becomes a stopgap device . . . until particularized legislation can be developed and passed to deal directly with the evil."). One commentator described the mail fraud statute as follows:

> To federal prosecutors of white collar crime, the mail fraud statute is our Stradivarius, our Colt 45, our Louisville Slugger, our Cuisinart—and our true love. We may flirt with RICO, show off with 10b-5, and call the conspiracy law 'darling,' but we always come home to the virtues of 18 U.S.C. § 1341, with its simplicity, adaptability, and comfortable familiarity.

Rakoff, *The Federal Mail Fraud Statute (Part I)*, 18 Duq. L. Rev. 771, 771 (1980).[4] This article responded in part to the emerging opposition to the "extension" of the mail and wire fraud

---

[3] The author Daniel J. Hurson was an Assistant U.S. Attorney for the District of Maryland who served on the prosecution team in the trial of Governor Marvin Mandel. *See infra.*
[4] The author Judge Jed S. Rakoff, in private practice at the time this article was published, ultimately came to serve as a District Judge for the United States District Court for the Southern District of New York.

statutes to prosecute "official corruption," specifically noting the high-profile prosecutions of former Maryland Governor Marvin Mandel[5] and United States Seventh Circuit Judge Otto Kerner, the former the Governor of Illinois. *Id.* at 772. It noted that the "crime of conspiracy 'to defraud' the United States, promulgated a few years before the mail fraud statute, was intended from the start to include bribery within its ambit and has been uniformly so interpreted by the Supreme Court." *Id.* at 780 n.46 (citing *United States v. Johnson*, 383 U.S. 169, 172 (1966); *Haas v. Henkel*, 216 U.S. 462, 479-80 (1910)).

In 1987, the Supreme Court "stopped the development of the intangible-rights doctrine in its tracks." *Skilling*, at 401 (discussing *McNally v. United States*, 483 U.S. 350 (1987)). In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court held that the federal mail fraud statute did not proscribe schemes to defraud citizens of their *intangible* rights to the honest services of their representatives. 483 U.S. at 356-361. "Rather than constru[ing] the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials," the Supreme Court read the statute "as limited in scope to the protection of *property* rights." *Id.* at 360 (emphasis added). "If Congress desires to go further, it must speak more clearly." *Id.*

With that invitation, Congress quickly responded by enacting 18 U.S.C. § 1346 to provide that a "scheme or artifice to defraud" under § 1341 may include "a scheme or

---

[5] For its part, this Court has handled its fair share of bribery cases testing the scope of federal bribery law. For example, former Maryland Governor Marvin Mandel was convicted of mail fraud and racketeering, but in the wake of the *McNally* decision, Judge Frederic Smalkin of this Court granted writs of error *coram nobis* vacating the defendants' mail fraud convictions. *United States v. Mandel*, 672 F. Supp. 864 (D. Md. 1987), *aff'd*, 862 F.2d 1067 (4th Cir. 1988). This Court first determined that *McNally* applied retroactively and then found that "however strong the evidence of dishonesty or bribery, the jury was told it could convict for something that did not amount to a federal crime," *id.* at 878, namely "the right of a state's citizens to honest and faithful government, explicitly disapproved in *McNally*, and the right of public officials to receive accurate information material to a decision, implicitly disapproved in *McNally*," *id.* at 875.

artifice to deprive another of the intangible right of honest services." Anti–Drug Abuse Act of 1988 § 7603(a), Pub. L. No. 100–690 (HR 5210), 102 Stat 4181 (codified at 18 U.S.C. § 1346). This provision became known as the "*McNally* Amendment" as it was "intended merely to overturn the *McNally* decision. No other change in the law [was] intended." 134 Cong. Rec. H11108-01 (daily ed. Oct. 21, 1988) (statement of Rep. Conyers); *see also Cleveland v. United States,* 531 U.S. 12, 19-20 (2000) (discussing the legislative history of 18 U.S.C. § 1346).

Once more, federal prosecutors brought cases against private sector officials for allegedly depriving their employer (and/or its shareholders) of the officials' honest services. In 2010, the Supreme Court again narrowed the scope of honest services wire fraud. In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court held:

> [T]here is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks. Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine. To preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law.

561 U.S. at 408-09 (footnotes omitted). Such a reading would not undermine fair notice to potential perpetrators when "it has always been as plain as a pikestaff that bribes and kickbacks constitute honest-services fraud." *Id.* at 412 (internal quotation marks omitted) (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 608 (1973) ("[E]ven if the outermost boundaries of [a statute are] imprecise, any such uncertainty has little relevance . . . where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions.")). Nor would the Court's reading create a risk of "arbitrary prosecutions." *Id.*

In terms of the facts of the *Skilling* case, the indictment charged three Enron executives, including its former CEO Jeffrey Skilling, with conspiracy to commit securities and wire fraud by "depriv[ing] Enron and its shareholders of the intangible right of [his] honest services." *Id.* at 369. Specifically, the executives had deceived investors by manipulating the company's publicly reported financial results and by making other false statements. *Id.* The Government did not, however, allege that Mr. Skilling had solicited or accepted side payments from a third party in exchange for making these misrepresentations. The Supreme Court therefore ruled out the honest-services theory, which requires such third-party payments to fulfill the "bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 409, 413. The court remanded the question of whether the case presented harmless error given the viability of the alternative theory of securities fraud. *Id.* at 414.

In 2016, former Governor of Virginia, Robert McDonnell, argued that the United States Supreme Court should vacate his convictions for conspiracy to commit honest services fraud, honest services wire fraud, conspiracy to commit Hobbs Act extortion, and Hobbs Act extortion. *McDonnell v. United States*, 136 S. Ct. 2355 (2016). McDonnell and his wife allegedly received $175,000 in loans, gifts, and other benefits from Virginia businessman Jonnie Williams, the CEO of Star Scientific, a Virginia-based company that had developed a nutritional supplement. *Id.* at 2361. In exchange for those benefits, McDonnell allegedly arranged meetings with state officials, hosted events at the Governor's Mansion, and contacted other officials to generate support for studies of the new supplement. *Id.* In a unanimous opinion, the Supreme Court clarified the scope of honest services wire fraud, finding that "hosting an event, meeting with other officials, or speaking with interested

parties is not, standing alone" an official "decision or action" under the federal definition of bribery. *Id.* at 2368. The Court added that "a decision or action to initiate a research study— or a decision or action on a *qualifying step*, such as narrowing down the list of potential research topics—would qualify as an 'official act.'" *Id.* at 2370 (emphasis added). In applying this holding to the jury instructions at trial, the Court vacated Governor McDonnell's convictions because the instructions exhibited errors that were not harmless. *Id.* at 2375.

The charges brought against Senator Oaks in this case do not require this Court to wrestle anew with statutory interpretation or other constitutional concerns. Rather, as discussed below, a straight-forward application of the Supreme Court's decision in *McDonnell*, 136 S. Ct. 2355, establishes that Oaks' request to the Department of Legislative Services for the drafting of legislation in the form of a bond bill constitutes an "official act" under the relevant portions of federal and state bribery law.

## II. Motion to Dismiss Count Four (Honest Services Wire Fraud)

Count Four of the Superseding Indictment alleges that Oaks committed honest services wire fraud under 18 U.S.C. §§ 1343 and 1346 (ECF No. 31 at 6-8), and the Defendant claims that this Count fails to state an offense. (*See* ECF No. 58.) The wire fraud statute, § 1343, criminalizes the use of wires to execute "any scheme or artifice to defraud." 18 U.S.C. § 1343. As explained above, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. In *Skilling*, the Supreme Court held that "§ 1346 covers only bribery and kickback schemes," where "bribery" takes its meaning from the federal bribery statute. 561 U.S. at 368, 413. Under the federal bribery statute, 18 U.S.C. § 201, it is unlawful for a "a public

official . . . directly or indirectly, corruptly [to] demand[], seek[], receive[], accept[], or agree[] to receive or accept anything of value . . . in return for [] being influenced in the performance of any official act." § 201(b)(2)(A). The bribery statute further defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." § 201(a)(3).

In *McDonnell*, the Supreme Court provided an in-depth breakdown of the two legal requirements of an "official act" for purposes of federal bribery and honest services wire fraud. 136 S. Ct. 2355. "First, the Government must identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." *Id.* at 2368. The question, matter, cause, suit, proceeding or controversy "must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 2373. The words "pending" and "may by law be brought" require the issue in question to be "specific and focused" — "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2369, 2373. Furthermore, "may by law be brought" means "something within the specific duties of an official's position— the function conferred by the authority of his office." *Id.* at 2369.

"Second, the Government must prove that the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *Id.* at 2368. In addition to reaching agreements, the decision or action requirement may

also be fulfilled by "exert[ing] pressure on another official to perform an 'official act,' or []
advis[ing] another official, knowing or intending that such advice will form the basis for an
'official act' by another official." *Id.* at 2372. The primary holding of *McDonnell*, based upon
the facts of that case, is that "setting up a meeting, talking to another official, or organizing
an event (or agreeing to do so)—without more—does not [qualify as an] 'official act.'" *Id.*
The Supreme Court in *McDonnell* provided further guidance, explaining that "a decision or
action to initiate a research study—or a decision or action on a *qualifying step*, such as
narrowing down the list of potential research topics—would qualify as an 'official act.'" *Id.* at
2370 (emphasis added).

   In his briefs, Senator Oaks argues that the facts alleged in the Superseding Indictment
are not sufficient as a matter of law. Specifically, the Defendant asserts that a *request* for a
*draft* of a bond bill, without allegations that he introduced it or promised to introduce it,[6]
does not constitute an "official act." The Defendant concedes that the question of whether
to enact a bond bill favorable to Mike's business is sufficiently focused and specific to qualify
as a "question or matter" under the first requirement for "official action," but Defendant
asserts that the alleged conduct "entails far less decision or action than 'setting up a meeting,
hosting an event, or calling another official'." (Reply 2, 4 (quoting *McDonnell*, 136 S. Ct. at
2370-71).) He also argues that it is "irrelevant that only a legislator can submit such drafting
requests to DLS." (Def.'s Count 4 Mot. 7, ECF No. 58). In urging this Court to disregard
the unique authority of only a member of the Maryland General Assembly to make such a

---

[6] The Defendant concedes the inescapable conclusion that introducing the bill would constitute an official act. *See, e.g.,*
*United States v. Stevenson,* 660 F. App'x 4, 7 n.1 (2d Cir. 2016) (summary order), *cert. denied,* 137 S. Ct. 1212 (2017) ("[A]
legislator who proposes legislation undoubtedly takes an action on the matter; he takes the essential action, without
which enactment of the matter into law cannot occur.") (internal citation omitted).

request, he cites *Valdes v. United States*, 475 F.3d 1319, 1329-30 (D.C. Cir. 2007) (en banc), in which the D.C. Circuit held that a police officer's use of "unique access" to a police database to find information to sell was insufficient to make the conduct an "official act." He also argues that many things a legislator can do by virtue of his or her position (e.g., use official letterhead, rely on staff support, and host official government events) do not constitute "official acts" under *McDonnell*.

The Government has responded that it is "irrelevant" that the bond bill was never introduced because the Defendant took the first step in requesting a draft to form the basis for a bill, which would be contemplated by the General Assembly for state funding, (Gov't Resp. 4.), and it emphasizes that only a legislator may submit a request to the Department of Legislative Services for a draft bill, *id.* at 7, 9 (citing Office of Policy Analysis, Dep't of Legis. Serv., *Guidelines for the Submission of Individual Bond Bill Requests to the Maryland General Assembly* 3, 6 (Nov. 2015)). Furthermore, the Government distinguishes *Valdes* by noting that the D.C. Circuit went on to explain that "inappropriate influence on decisions that the government actually makes," would constitute an "official act[ion]" under 18 U.S.C. § 201(a)(3). 475 F.3d at 1325. Enacting legislation, or promising to do so, is exactly the kind of decision that a legislator actually makes. (*See* Resp. 7-8 (citing *United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017); *United States v. Fattah*, 223 F. Supp. 3d 336, 343 (E.D. Pa. 2016)).)

At the hearing on March 16, 2018, Defense Counsel argued that under a proper reading of *McDonnell*, the act of drafting government documents, such as a bond bill or an indictment, can *never* qualify as an official act. In the Defendant's view, the act of typing words on a computer screen should not constitute an official act for the purposes of federal

bribery law. The Defendant urged this Court to limit "qualifying step," as noted by the Supreme Court in *McDonnell*, 136 S. Ct. at 2370, to the research study context at issue in that case. Counsel for the Government emphasized that drafting a bill constitutes a qualifying step and goes to the heart of a legislator's official purpose.

As an initial matter, this Court notes that the Superseding Indictment alleges an agreement to take "official action," the element in question. (ECF No. 31 at 7 ("It was the purpose of the scheme for Oaks to secretly use his official posit[i]on to enrich himself by accepting cash bribe payments from Mike in exchange for favorable official action.").) In demanding more *facts* to support the "official action" element, the Defendant relies on the statement in *United States v. Palin*, 874 F.3d 418, 424 (4th Cir. 2017), that "[w]hen the words of a statute are used to describe the offense generally, they 'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged,'" but that passage directly quotes *Hamling v. United States*, 418 U.S. 87, 117-118 (1974), in which the Fourth Circuit clarified that specific facts need *not* accompany statutory language when the language in question is "sufficiently definite in legal meaning to give a defendant notice of the charge against him." *Hamling*, 418 U.S. at 118-119; *see also United States v. Amend*, 791 F.2d 1120, 1125 (4th Cir. 1986) (holding that specific acts need not be alleged where the defendant has adequate notice of the nature of the charges). The Fourth Circuit in the *Palin* case did not announce a new, heightened pleading requirement regarding the elements of the offense, and Senator Oaks does not attack the Superseding Indictment for failure to provide him with adequate notice.

Rather, the Defendant argued at the hearing that an honest services indictment must allege everything *McDonnell* requires in jury instructions. In the aftermath of the *McDonnell* decision, one court has already rejected this argument. *United States v. Williams*, No. 316CR00003TCBRGV, 2016 WL 10649420, at *6 (N.D. Ga. Oct. 19, 2016), *report and recommendation adopted*, No. 3:16-CR-00003-TCB, 2017 WL 1030804 (N.D. Ga. Mar. 16, 2017). This Court finds no basis to extend the full breadth of *McDonnell* to indictments, which should be judged by their "practical" purpose. *See United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994). Furthermore, even under *McDonnell*, an agreement to take official action "need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain." 136 S.Ct. at 2371.[7] The precise question before this Court is whether a state legislator's request to a state administrative or legislative agency for a draft bond bill constitutes an "official act" as defined in the federal bribery statute, 18 U.S.C. § 201(a)(3).

As the Supreme Court declared in *McDonnell*, "a decision or action to initiate a research study—or a decision or action on a *qualifying step*, such as narrowing down the list of potential research topics—would qualify as an 'official act.'" *Id.* at 2370 (emphasis added); *see also United States v. Conley*, No. 3:13-CR-00028-GFVT-REW-1, 2017 WL 5953153, at *9 n.11 (E.D. Ky. Dec. 1, 2017) (acknowledging the "qualifying step" language as an independent theory of liability and finding that, "at the barest minimum," fraudulently presenting a co-

---

[7] Count Four of the Superseding Indictment in this case specifically alleges that Oaks submitted a request for the drafting of legislation in the form of a bond bill, received a copy of the draft of that bill, and transmitted it to "Mike." There is ample authority in the aftermath of *McDonnell* that even *implicit* agreements to take official action qualify as official acts. *See United States v. Malkus*, 696 F. App'x 251, 252 (9th Cir. 2017) (affirming that an *implicit* agreement is sufficient under *McDonnell*; *United States v. Tavares*, 844 F.3d 46, 57 (1st Cir. 2016) (acknowledging that evidence *at trial* may enable a jury to "*infer*" what specific official act" the alleged bribe was intended to induce) (emphasis added); *United States v. Jones*, 207 F. Supp. 3d 576, 582 (E.D.N.C. 2016) (finding that an indictment sufficiently alleged an *implicit* agreement under *McDonnell* by simply stating that Defendant "did, in fact, give the [TFO] $100.00 in cash").

conspirator's contract bid to the ultimate government decision-maker constitutes a 'qualifying step.'"). Senator Oaks' attempt to avoid a straight-forward application of the "qualifying step" prong is unavailing.

The example of an exclusionary decision, namely "narrowing down the list of potential research topics," is explicit guidance provided by the Supreme Court in *McDonnell* on the content of this theory of criminal liability, and the larger context of the opinion helps to clarify the spectrum of conduct. At one end, a qualifying step, essentially by definition, does not require a *final* decision or action. At the other end, *McDonnell's* core holding that "setting up a meeting, talking to another official, or organizing an event . . . without more" is insufficient, *id.* at 2372, indicates that a "decision or action on qualifying step" requires more than conduct that advances a political goal. Additionally, "qualifying step" requires something more than but-for causation because *McDonnell* does not require the final official act to have occurred. *See, e.g., id.* (agreement is enough); *see United States v. Fattah*, 223 F. Supp. 3d 336, 343 (E.D. Pa. 2016) (finding that a legislator's promise to secure an earmark is a "quintessential official act" under *McDonnell*). Even proximate causation, or foreseeability, would be difficult to square with *McDonnell* because government action favorable to Star Scientific was arguably among the foreseeable results of Governor McDonnell's conduct. In addition to this context, the United States District Court for the Eastern District of Kentucky has determined that manipulating a contract-award process to favor a specific bidder before the matter reaches the final decision-maker also qualifies as a qualifying step. *Conley*, 2017 WL 5953153, at *9 n.11.

In this case, the Defendant's alleged request for a draft bond bill falls squarely within the confines of "a decision or action on a qualifying step." *McDonnell*, 136 S. Ct. at 2370. The parties agree that obtaining a draft bond bill does not automatically trigger formal consideration by the legislature, but under the "qualifying step" prong that detail is of no moment. Beyond the fact that the Defendant's transmission of the completed draft to Mike may establish an *implicit* agreement to actually introduce the bill, *see supra* (citing *McDonnell*, 136 S.Ct. at 2371; *Malkus*, 696 F. App'x at 252; *Tavares*, 844 F.3d at 57; *Jones,* 207 F. Supp. 3d at 582), the draft request also represents an essential exclusionary decision like the example of research topic selection in *McDonnell* and the bid-ranking process in *Conley*. To be clear, the Superseding Indictment alleges that the draft bond bill would, if passed, authorize $250,000 in state funding for the "Multi-Family Housing Development at Druid Park Lake." (ECF No. 31 at 7.) The draft bill identifies a *single* project as the recipient of state funding. It does not leave the recipient information blank or even identify a group of candidates. The time to decide which of Mike's ventures to support had passed. Bond bills can support a range of economic developments, including "health facilities, historic preservation projects, museums, and sports and recreation facilities." (*Id.* at 6.)

In Maryland, "[b]ond bills must contain certain technical information to legally permit funds to be disbursed. Therefore, after DLS drafts a bond bill, the sponsor and requesting organization should refrain from altering the language in the bill." Office of Policy Analysis, Dep't of Legis. Serv., *Guidelines for the Submission of Individual Bond Bill Requests to the Maryland*

*General Assembly* 4 (Nov. 2015).[8] If a change is necessary, the sponsor is directed to call DLS to request the change. *Id.* This unique, technical, and formal process distinguishes draft bond bills from, e.g., a handwritten or computer-generated draft prepared by a legislator's personal staff member, without any request to the Department of Legislative Services. Drafting a bond bill is also the first *required* step in enacting any bond bill.[9] It was only through Defendant's authority as an elected member of the House of Delegates that he was able to procure a draft bond bill from DLS. *Id.* at 3, 6. The Superseding Indictment further provides that, at the time of the offense, a bond bill "had to be introduced by both a member of the House of Delegates and a member of the Senate." (ECF No. 31 at 6.) Sending a draft bond bill to the bill's purported beneficiary also makes the ultimate introduction of the bill a foreseeable next step. These alleged facts represent something "more" than the mere meetings, calls, events at issue in *McDonnell. See McDonnell*, 136 S. Ct. at 2372.

Additional considerations cement the instant allegations within the range of conduct proscribed by federal law after *McDonnell.* Drafting legislation lies at the very heart of a legislator's official purpose. A draft bill is therefore distinct from other conduct based merely on a legislator's privileged access or administrative perqs, which alone do not make conduct "official" under 18 U.S.C. § 201(a)(3). *See McDonnell*, 136 S. Ct. at 2368; *United States v. Silver*, 864 F.3d 102, 120 (2d Cir. 2017) (use of official letterhead insufficient under *McDonnell*); *Valdes*, 475 F.3d at 1329-30. This confluence of action and core authority, or purpose, also

---

[8] This government document provides *legal*, rather than factual, authority. As such, this Court may properly consider it when judging the legal sufficiency of the Superseding Indictment. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952).

[9] Again, taking such a step supports an inference of an *implied* agreement to follow through with actually introducing the legislation.

contrasts with Governor McDonnell's own testimony that he "ha[d] limited decision-making power in this area." 136 S. Ct. at 2363.

Accordingly, Defendant's Motion to Dismiss Count Four (Honest Services Wire Fraud) (ECF No. 58) is DENIED.

## III. Motion to Dismiss Counts Five through Nine (Travel Act Counts)

The second pending motion is the Defendant's Motion to Dismiss Counts Five through Nine (Travel Act Counts) in which the Defendant claims (a) that those five counts fail to state an offense and (b) that the underlying Maryland bribery statute is unconstitutionally vague. (ECF No. 57.)

### A. Sufficiency of the Superseding Indictment

The relevant parts of the Travel Act, found at 18 U.S.C. § 1952, provide three elements for establishing a violation of the act:

(1) Use [of] the mail or any facility in interstate or foreign commerce
(2) With intent to. . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity; and
(3) Thereafter perform[ance] . . . [of] an act [to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity].

18 U.S.C. § 1952(a). The statute provides that "unlawful activity" includes "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." 18 U.S.C. § 1952(b). The operative Superseding Indictment in this case identifies bribery under Maryland law, specifically Maryland Code, Criminal Law § 9-201, as the "unlawful activity" sustaining the Travel Act counts. The relevant part of the Maryland bribery statute provides that "[a] public employee may not demand or receive a bribe, fee,

reward, or testimonial to . . . influence the performance of the official duties of the public employee." Md. Code, Criminal Law § 9-201(c).

The principal case setting the contours of "official duties" under Maryland's bribery statute is *Thomas v. State of Maryland,* 960 A.2d 666 (Md. Ct. Sp. App. 2008). In that case, the Maryland Court of Special Appeals held that a "public employee violates the provision of the bribery statute by demanding or receiving a bribe to influence the employee's performance of duties that are either *expressly* authorized, *e.g.,* by statute, rule, or regulation, *or implicitly* authorized." *Id.* at 675 (emphases in original).

Echoing his Motion to Dismiss Count Four, Senator Oaks first asserts that the Superseding Indictment lacks the requisite facts. (ECF No. 57 at 4 (citing *United States v. Palin,* 874 F.3d 418, 424 (4th Cir. 2017)). Specifically, he notes that "[n]owhere in the [I]ndictment is there any mention of an official duty – express or implied – that Senator Oaks performed or agreed to perform in exchange for a bribe." (*Id.*) The Defendant also argues that *federal* bribery law, including *McDonnell* and his interpretation thereof (*see supra*), should constrain the scope of "official duties" under Maryland's bribery statute. (*Id.* 9-12 (citing *Richardson v. State,* 492 A.2d 932, 936 (Md. App. 1985); *Kable v. State,* 299 A.2d 493, 496-97 (Md. App. 1973); and this Court's previous opinion in *United States v. Currie,* No. CRIM. RDB-10-0532, 2011 WL 3439942, at *5 (D. Md. Aug. 5, 2011)). Oaks essentially contends that the Government's view of "official duties" under Maryland law conflicts with the Supreme Court's recent holding in *McDonnell* that an official's authority – whether explicit or implied – is not alone sufficient to establish an "official act." *See McDonnell,* 136 S. Ct. at 2370 (clarifying that conduct under *customary* authority, as seen in *United States v.*

*Birdsall*, 233 U.S. 223, 230-31 (1914)), must still satisfy the "decision or action" requirement of *McDonnell*).

The Government responds that Defendant's request for a draft bond bill constitutes the performance of an *expressly* authorized duty. Specifically, the "Guidelines for the Submission of Individual Bond Bill Requests to the Maryland General Assembly" state that "organizations seeking funding must contact a senator and a delegate to sponsor a bond bill that requests funding for their project" and "the sponsors will request that the bill be drafted by DLS." (Gov't Resp. 9-10, ECF No. 70 (quoting Office of Policy Analysis, Dep't of Legis. Serv., *Guidelines for the Submission of Individual Bond Bill Requests to the Maryland General Assembly* [3, 6] (Nov. 2015)).) The Government also notes that the Court of Special Appeals of Maryland held in *Richardson v. State*, 492 A.2d 932 (Md. Ct. Spec. App. 1985) that the conduct need only "bear some *relation* to his official duties." 492 A.2d at 937. However, the parties agree that this Court should once again look to *McDonnell* for guidance in determining the proper scope of "the performance of official duties" under Maryland bribery law.

The Superseding Indictment alleges that the Defendant "would receive and agreed to receive cash bribe payments in order to influence the performance of his official duties" (ECF No. 31 at 9), which tracks the statutory language of § 9-201(c). Accordingly, this Court once again proceeds to the question of whether, as a matter of law, the draft bond bill falls within the Defendant's "official duties." Md. Code, Criminal Law § 9-201(c).

The Defendant again argues that the Court of Special Appeals' decision in *Richardson*, which reaches any conduct that "bears some *relation* to his official duties," 492 A.2d at 937, is at odds with *McDonnell*'s holding that official meetings, calls, and events – without more – do

22

not suffice, 136 S. Ct. at 2372. For the same reasons stated above, the Travel Act Counts, which incorporate by reference the draft bond bill allegation, survive under *McDonnell*'s holding that "decision or action on a qualifying step" constitutes official action. 136 S. Ct. at 2370; *see supra.*

## B. Vagueness Challenge

Senator Oaks has also raised a constitutional vagueness challenge under the Fifth Amendment. *See Johnson v. United States,* 135 S. Ct. 2551, 2556 (2015). His primary concern is that the "implicitly authorized" prong in *Thomas,* 960 A.2d 666, which reaches conduct "bear[ing] some *relation* to his official duties," *Richardson,* 492 A.2d at 937, fails to provide the fair notice required by the Constitution.[10] In response, the Government points to this Court's own rejection of the same argument in the *Currie* case. *See United States v. Currie,* No. RDB-10-0532, 2011 WL 3439942, at *3-6 (D. Md. Aug. 5, 2011) (citing *Thomas,* 413 Md. 247, in rejecting vagueness challenge to scope of "official duties"). It also argues that the Supreme Court's opinion in *McDonnell* approves its prior decision in *Birdsall* holding that official action could be established by "custom." *McDonnell,* 136 S. Ct. at 2371 (citing *Birdsall,* 233 U.S. at 230-31).

The prior opinions of the Maryland Court of Special Appeals in *Thomas* and *Richardson* may stand in some tension with the Supreme Court's recent decision in *McDonnell.* However, the allegations set forth in Counts Five through Nine do not give rise to a constitutional

---

[10] In his Reply, the Defendant also raises the overbreadth and federalism concerns discussed in *McDonnell.* (Def.'s Reply 17-18.) Again, this Court's interpretation of § 9-201(c) of the Maryland Code is consistent with *McDonnell* and therefore does not implicate these concerns.

vagueness challenge in this case.[11] In this case, the Defendant's alleged request for a draft bond bill falls squarely within the core of *McDonnell's* proscriptions and was based on the Defendant's exclusive and explicit authority as a member of the Maryland General Assembly. Office of Policy Analysis, Dep't of Legis. Serv., *Guidelines for the Submission of Individual Bond Bill Requests to the Maryland General Assembly* 3, 6 (Nov. 2015). The post-*McDonnell* viability of the "implicitly authorized" prong in *Thomas,* 960 A.2d 666, is not implicated here.

Having addressed both of the Defendant's challenges to Counts Five through Nine, this Court holds that the Defendant's Motion to Dismiss Counts Five through Nine (Travel Act Counts) (ECF No. 57) is DENIED.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss Count Four (ECF No. 58) is DENIED, and Defendant's Motion to Dismiss Counts Five through Nine (ECF No. 57) is also DENIED.

A separate Order follows.

Dated: March 20, 2018                    *Rchd D. Bennett*

Richard D. Bennett
United States District Judge

---

[11] Like in *McDonnell,* 136 S. Ct. at 2375, this Court can construe and apply the statute so as to avoid a constitutional question. *See Broadrick v. Oklahoma,* 413 U.S. 601, 608 (1973) ("[E]ven if the outermost boundaries of [a statute are] imprecise, any such uncertainty has little relevance . . . where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions.'"))